1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

SANDRA DURAN MENDEZ,

                                    Plaintiff,

        v.

MICHAEL J. ASTRUE, COMMISSONER
OF SOCIAL SECURITY,

                                    Defendant.

Case No. 3:11-CV-00838-BTM-DHB

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT AND DENYING
DEFENDANT'S CROSS-MOTION
FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

On May 4, 2008, Plaintiff Sandra Duran Mendez filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, alleging disability since April 1, 2008. (Tr. 129.)  Plaintiff's application was denied initially and on reconsideration. (Tr. 14.) Plaintiff filed a request for a hearing, and on May 18, 2010, Plaintiff testified at the hearing before Administrative Law Judge Norman R. Buls (the "ALJ").  On June 8, 2010, the ALJ issued a decision denying benefits.  Plaintiff filed a request for review with the Appeals Council, which was denied.  (Tr. 1-3.)  The ALJ's decision then became the Commissioner of Social Security's final decision. On April 21, 2011, Plaintiff filed this action, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

Plaintiff and Defendant have filed cross-motions for summary judgment. For the reasons set forth below, Plaintiff's motion is **GRANTED** and Defendant's motion is **DENIED**.

## II.  FACTUAL BACKGROUND

Plaintiff was born on March 25, 1964.  (Tr. 129.)  Between April 1984 and January 1998, Plaintiff served as an Inventory Management Craftsman in the Air Force, a job that required her to physically move objects during the day, sometimes with the use of a machine.  (Tr. 120-21.)  While on active duty, Plaintiff suffered a back injury from playing racquetball in 1985, and has since complained of pain in her lower back.  (Tr. 561-62.)  In 1992, Plaintiff first experienced symptoms of fibromyalgia[1] and was later diagnosed with fibromyalgia in February 1996.  (Tr. 425, 543.)  In 1998, Plaintiff was honorably discharged from the Air Force for failing to control her weight.  (Tr. 108.)

After her discharge from the Air Force, Plaintiff worked as a car salesman, material coordinator, purchasing superintendent, and substitute teacher. (Tr. 120.) Plaintiff has a high school diploma and a four-year college degree. (Tr. 66.)  Plaintiff alleged disability beginning April 1, 2008, due to pain from fibromyalgia, carpal tunnel syndrome, arthritis, degenerative disc disease, an old back injury, hypothyroid, and depression. (Tr. 119.)  Subsequent to Plaintiff's alleged disability onset date of April 1, 2008, Plaintiff engaged in substantial gainful activity from April 1, 2008 to June 5, 2008. (Tr. 16.)  Plaintiff has not worked since June 5, 2008. (Id.)

//

_____

[1]   Fibromyalgia is a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue. Benecke v. Barnhart, 379 F.3d 589, 589 (9th Cir. 2004).  The common symptoms of fibromyalgia are "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease." Id. at 589-90 (internal citations omitted). "[T]he only symptom that discriminates between it and other diseases of a rheumatic character [is] multiple tender spots, more precisely [eighteen] fixed locations on the body." Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996).  Claimants typically must have at least eleven positive trigger points to be diagnosed with fibromyalgia. Id.

3:11-CV-00838-BTM-DHB

A.      Plaintiff's Medical Treatment

Plaintiff has been treated at the Veteran Administration Medical Center since 1998. (Tr. 552.)

In 1998, Plaintiff was diagnosed with right-sided carpal tunnel syndrome and had surgery on her right hand in 2002. (Tr. 225.)  Although the surgery improved Plaintiff's symptoms significantly, by 2006, Plaintiff's symptoms returned.  (Tr. 226.)

On October 1, 2007, Plaintiff was referred to Eileen Apfel, a Registered Occupational Therapist, with complaints of extreme pain in her right hand and difficulty sleeping.  (Tr. 290-91.)  Ms. Apfel observed swelling in Plaintiff's right wrist and noted that Plaintiff was likely experiencing a fibromyalgic flare that irritated nerves in her right arm. (Tr. 293.)

On January 24, 2008, Plaintiff visited Dr. Sunita C. Baxi with complaints of increased pain and fatigue. (Tr. 287, 289.)  Dr. Baxi noted that Plaintiff appeared in pain and demonstrated tenderness in trigger points. (Tr. 288.)

On February 11, 2008, Dr. Terkeltaub, the Section Chief of Rheumatology, noted that upon physical examination, Plaintiff demonstrated trigger points in her right trapezius, lumbar-sacral region, left medial fat pad on the knee, and right elbow . (Tr. 286.)  Dr. Terkeltaub also noted that Plaintiff had non-restorative sleep and positive tender points, which are compatible with primary fibromyalgia, and appeared in pain. (Tr. 285-86.)

On February 25, 2008, Plaintiff visited Dr. Spencer Lin for a routine rheumatology followup examination.  Dr. Lin noted that Plaintiff showed positive trigger points in her back and along her arms. (Tr. 282.)

On March 3, 2008, Dr. Kenneth C. Kalunian, a rheumatology staff physician, examined Plaintiff and noted that Plaintiff had diffuse trigger points but no joint tenderness in her hands or wrists. (Tr. 284.)

On March 17, 2008, Dr. Brian Greenberg, a rheumatology fellow, examined Plaintiff and noted that Plaintiff demonstrated diffuse muscular tender points, which were

1    most pronounced in the right arm. (Tr. 278.)

2        On April 11, 2008, Plaintiff visited Dr. Baxi with complaints of pain "all over,"

3    fatigue, difficulty sleeping, arthritis pain in the joints of both hands, and lower back pain.

4    (Tr. 273-74.)

5        On April 21, 2008, Plaintiff visited Dr. Nipaporn Pichetshote for a followup

6    rheumatology examination.  Dr. Pichetshote noted Plaintiff demonstrated "TTP in all

7    tender spots" including chest, bilateral arms, back, hip, and knees and that Plaintiff

8    "recoiled with palpitation." (Tr. 272.)  Dr. Pichetshote also noted that Plaintiff appeared

9    depressed and therefore started Plaintiff on Prozac. (Tr. 273.)

10       On May 27, 2008, Plaintiff visited Michelle R. Amos, a Licensed Clinical Social

11   Worker, complaining of increased fibromyalgia as well as depression symptoms. (Tr.

12   265.)  Plaintiff was referred to Dr. Christine Y. Moutier for a psychiatry consultation.  (Tr.

13   263.)

14       On June 23, 2008, Dr. Moutier noted that Plaintiff showed cognitive symptoms of

15   depression including poor memory, attention, and ability to focus, as well as low

16   motivation, energy, sleep disruption, and negative self-image. (Tr. 257.)  Dr. Moutier

17   observed that Plaintiff was "clearly uncomfortable and in pain at times with apparent ms

18   spasms." (Tr. 258.)

19       On June 22, 2008, Plaintiff saw Dr. Valette for an extended psychological

20   consultation conducted for the Department of Social Services, Disability Evaluation

21   Department. (Tr. 194.)  Dr. Valette observed Plaintiff's mood as being "slightly dysthymic"

22   and noted Plaintiff's difficulties related primarily to physical problems. (Tr. 195.) Dr.

23   Valette also remarked that with proper medical treatment for her dysthymia, Plaintiff may

24   be able to function at a higher level.  (Tr. 195.)  Dr. Valette concluded that Plaintiff had

25   slight limitations due to dysthymia on her ability to complete complex tasks and her ability

26   to concentrate for at least two-hour increments at a time. (Id.)

27   //

28   //

On June 29, 2008, Plaintiff visited Dr. Jeannette Del Valle, a Board Certified Internal Medicine and Geriatrics, for a physical evaluation conducted for the Department of Social Services, Disability Evaluation Department.  (Tr. 197-99.)  Dr. Del Valle found that Plaintiff was reliable (Tr. 197) and observed that Plaintiff moved about the office without help.  (Tr. 198.)  Dr. Del Valle noted that Plaintiff demonstrated a full range of motion, no tenderness to palpations in her back, shoulders, hands, wrists, or knees, and no spasms in her back. (Id.)  Based on physical examination and observation, Dr. Del Valle concluded that Plaintiff had no physical functional limitations. (Tr. 199.)

On July 2, 2008, Dr. H. Skopec conducted a psychiatric review technique. (Tr. 200.)  Based on a review of Plaintiff's medical records, Dr. Skopec opined that Plaintiff had a mood disorder (Tr. 203) and that her impairment was not severe. (Tr. 200.)

Beginning on July 2, 2008, Plaintiff attended Acceptance Based Group for Chronic Pain, a six-session group therapy under the direction of Dr. Jill Stoddard, a clinical psychologist. (Tr. 256.)  In sessions one and two, Dr. Stoddard noted that Plaintiff's mood was  "mildly dysphoric with congruent affect." (Id.)  In sessions three, four, five, and six, Dr. Stoddard noted that Plaintiff's mood was  "euthymic with congruent affect." (Tr. 250-52, 255.)

On July 21, 2008, Plaintiff visited Dr. Terkeltaub, who noted that Plaintiff had fibromyalgia and clinical depression. (Tr. 253.)   In his treatment notes, Dr. Terkeltaub remarked that Plaintiff felt dizzy and drowsy from the drug combination of Prozac, Elavil, and Lyrica.  Dr. Terkeltaub also noted that although Plaintiff's fibromyalgia symptoms have improved substantially on this low dose of Lyrica, she still experienced pain in her right arm and that Plaintiff "still has widespread tender points in stereotypic locations for fibromyalgia." (Id.)

On July 29 and 30, 2008, Plaintiff was tested for sleep apnea in the sleep clinic (Tr. 174) and was diagnosed with moderate obstructive sleep apnea syndrome. (Tr. 248.) Plaintiff began a trial of Auto-CPAP, a sleep aid machine.  (Id.)

//

3:11-CV-00838-BTM-DHB

On October 10, 2008, Dr. Kalunian noted that upon physical examination, Plaintiff demonstrated positive tender points. (Tr. 243.)  Dr. Kalunian also noted that Plaintiff was sleeping better and tolerating pain better on Lyrica but still woke up multiple times a night. Dr. Kalunian also remarked that Plaintiff felt "foggy" since starting Lyrica, (Tr. 241-43.)

On November 13, 2008, Dr. Moutier noted that Plaintiff still felt foggy, groggy, and was experiencing memory problems. (Tr. 236.)  Dr. Moutier also noted that she discussed Plaintiff's medicine combination and side effects with Dr. Terkeltaub. (Id.)

On December 15, 2008, Dr. Moutier noted that Plaintiff was "doing well from a depression standpoint with improvement in motivation, mood, and interest."  (Tr. 234.) Dr. Moutier also remarked that after Plaintiff had been off Lyrica for two weeks, Plaintiff felt less confused and experienced less problems with her memory, but Plaintiff's pain had "worsened significantly."  (Id.)

On December 18, 2008, Dr. Terkeltaub observed that due to Plaintiff's medication, she was suffering from "mental fogginess" and higher levels of pain. (Tr. 254.)

On December 31, 2008, Dr. Ross conducted a physical residual functional capacity assessment. (Tr. 303.)  After reviewing Plaintiff's medical records, Dr. Ross concluded that Plaintiff could occasionally and frequently lift and carry ten pounds; stand or walk at least two hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; push or pull for an unlimited amount; occasionally climb ramps, stairs, ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, or crawl; and never balance; avoid even moderate exposure to extreme cold, extreme heat, or vibration; and avoid all exposure to hazards such as machinery and heights. (Tr. 304-06.)  Dr. Ross opined that Plaintiff has no manipulative, visual, or communication limitations. (Tr. 305.) Regarding the severity of Plaintiff's fibromyalgia symptoms, Dr. Ross concluded Plaintiff's pain was the major issue.  However, Dr. Ross found that Plaintiff's only tally of actual classic trigger points shows four of eighteen and that joints do not show synotvitis or deformity. (Tr. 307.)  Finally, Dr. Ross concluded that Plaintiff had credibility issues

because in his opinion, the medical reports do not support Plaintiff's claims of disability to the extent portrayed to the Social Security Administration. (Tr. 307.)

On January 12, 2009, Dr. Terkeltaub examined Plaintiff and opined that Plaintiff had eighteen of eighteen fibromyalgia tender points. (Tr. 391.)

On February 23, 2009, Dr. Terkeltaub examined Plaintiff and concluded Plaintiff still demonstrated greater than ten of eighteen tender points.  (Tr. 387.)

On March 23, 2009, Dr. Moutier observed that Plaintiff feels awake, alert, and positive most days, unless she has a poor sleep the night before.  Additionally, Dr. Moutier noted that Plaintiff rates the pain as "4/10" that worsens during the course of each day.  (Tr. 384.)

On May 11, 2009, Dr. Moutier noted that Plaintiff was feeling "moderately improved" and that Plaintiff's depression was "well-controlled."  (Tr. 373.)  Dr. Moutier also remarked that Plaintiff's pain was the main focus of her treatment. (Id.)

On May 18, 2009, Dr. Terkeltaub noted that Plaintiff's pain had decreased to a four or five rating, but Plaintiff was still experiencing deep aching.  (Tr. 371-72.)  Dr. Terkeltaub also observed Plaintiff looked much better and moved more briskly into her chair in the clinic, but she still showed greater than ten of eighteen stereotypic tender points for fibromyalgia, although less tender. (Id.)

On June 17, 2009, Dr. Moutier noted that while Plaintiff's pain had improved most of the time, her mood was "much worse," and she was unable to visit her mother. (Tr. 366.)

On August 10, 2009, Dr. Moutier noted that Plaintiff experienced "significant improvements" in energy, motivation, and interests such as the ability to cook and see family. (Tr. 360.)  Dr. Moutier remarked that Plaintiff also experienced an increase in pain from being more active. (Id.)

On September 14, 2009, Dr. Terkeltaub noted that Plaintiff was sleeping better and was tolerating the medication well for her depression and fibromyalgia. (Tr. 355.)  Dr.

Terkeltaub also noted Plaintiff's pain level was variable and that "all her tender points are less better." (Tr. 355-56.)

On December 2, 2009, Dr. Benjamin R. Dishman noted that since taking Ritalin, Plaintiff had become more active, including babysitting, reading, watching TV, working on the internet, and playing solitaire and that her sleep and motivation had improved. (Tr. 349.)  Dr. Dishman, however, also noted that Plaintiff's energy level was difficult to rate due to the increased use of Tramadol for Plaintiff's increased pain, and that her pain was still keeping Plaintiff from activities.  (Id.)

In a letter dated February 8, 2010, Dr. Moutier opined that after almost two years of treatment, Plaintiff was completely disabled due to her diagnosed Major Depressive Disorder, Fibromyalgia, and a number of other medical problems.  (Tr. 314.) Dr. Moutier explained:

> Ms. Mendez was able to work until June 2008 as a substitute teacher, but had been struggling to manage increasing physical pain related to Fibromyalgia and Osteoarthritis over the year prior to her stopping working.  By the time she stopped working, she was experiencing severe, unremitting physical pain, and her Major Depressive Disorder had begun as well.  Ms. Mendez is a person with a high level of personal attribute that would lead her to work hard and take pride in her work, were it at all possible for her to work. . . .
> While her treatment plan has been aggressive and she has been 100% compliant with treatment, the treatment has only proven partially effective thus far at resolving her symptoms, leaving her in a completely disabled state.

(Id.)  Dr. Moutier concluded that Plaintiff was truly disabled from physical pain and depressive symptoms due to Fibromyalgia, other pain conditions, and Major Depressive Disorder. (Id.)


B.     Plaintiff's Testimony at the ALJ hearing

During the ALJ hearing on May 18, 2010, Plaintiff contended that her fibromyalgia symptoms – pain in her legs, hips, back, arm, and chest as well as muscle spasms, swollen joints, and shooting pains in her chest – prevented her from working as a substitute teacher. (Tr. 75-77.)  Plaintiff testified that although she was diagnosed with

fibromyalgia in 1996, her symptoms began to worsen around October 2007 so that by June 2008, she could no longer manage the pain from her fibromyalgia, back injury, and arthritis. (Tr. 67, 72.)  According to Plaintiff, she is only able to sit for fifteen to twenty minutes at a time due to the pain, and her medication causes difficulty with memory and concentration. (Tr. 76-78).

## III.  ALJ'S FINDINGS AND CONCLUSIONS

The ALJ found that Plaintiff met the requirements for disability insurance benefits through December 31, 2012.

The ALJ found that Plaintiff has the following medically determinable "severe" impairments: fibromyalgia; mild degenerative disc disease of the lumbar spine at L3-4 and moderate degenerative disc disease of the lumbar spine at L4-5; minimal osteoarthritis of the right hip and minimal osteoarthritis of bilateral sacroiliac joints; moderate obstructive sleep apnea syndrome with mild desaturation;  and obesity with a body mass index (BMI) of 36.3 at the time of the hearing. (Tr. 16-17.)

The ALJ also found that Plaintiff's medically determinable mental impairment of depression was "nonsevere" because it does not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities.  The ALJ considered the four broad functional areas and found Plaintiff has: (1) a mild limitation in activities of daily living due to back pain and fibromyalgia; (2) no limitations in social functioning; (3) no limitations regarding concentration, persistence, or pace; and (4) no episodes of extended periods of  decompensation. (Tr. 17.)

The ALJ concluded that Plaintiff's impairment or combination of impairments do not meet or equal one of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ determined that Plaintiff has the residual functional capacity to perform sedentary work, with the following nonexertional limitations: never climbing ladders, ropes or scaffolds; occasionally climbing ramps and stairs; occasionally  balancing, stooping,

and kneeling; occasionally crouching and crawling; avoiding moderate exposure to extreme heat and extreme cold; avoiding vibration; avoiding all exposure to machinery and heights.

The ALJ found that Plaintiff is unable to perform any past relevant work. Considering Plaintiff's age, education, work experience, and residual functional capacity, however, the ALJ found that Plaintiff can perform jobs that exist in significant numbers in the national economy.  Accordingly, the ALJ concluded that Plaintiff has not been under a "disability" as defined in the Social Security Act, from April 1, 2008, through the date of the ALJ's decision.[2]

## IV.  **STANDARD OF REVIEW**

The Commissioner's denial of benefits may be set aside if it is based on legal error or is not supported by substantial evidence.  Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance.  Id.  Substantial evidence is "relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."  Flaten v. Secretary of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995).

_____

[2]  Under the Social Security Regulations, the determination of whether a claimant is disabled within the meaning of the Social Security Act is a five-step process.  The five steps are as follows: (1) Is the claimant presently working in any substantially gainful activity?  If so, then the claimant is not disabled.  If not, then the evaluation proceeds to step two.  (2) Is the claimant's impairment severe?  If not, then the claimant is not disabled.  If so, then the evaluation proceeds to step three.  (3) Does the impairment "meet or equal" one of a list of specific impairments set forth in Appendix 1 to Subpart P of Part 404?  If so, then the claimant is disabled.  If not, then the evaluation proceeds to step four.  (4) Is the claimant able to do any work that she has done in the past?  If so, then the claimant is not disabled.  If not, then the evaluation proceeds to step five.  (5) Is the claimant able to do any other work?  If not, then the claimant is disabled.  If, on the other hand, the Commissioner can establish that there are a significant number of jobs in the national economy that the claimant can do, the claimant is not disabled.  20 C.F.R. § 404.1520.  See also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

# V. **DISCUSSION**

Plaintiff contends the ALJ's decision was erroneous because the ALJ (1) failed to give proper weight to or provide sufficient reasons for rejecting Plaintiff's treating physicians' opinions; (2) failed to provide sufficient reasons for discrediting Plaintiff's pain testimony; (3) failed to give proper weight to Plaintiff's Veteran Administration (VA) disability rating; (4) failed to give proper consideration to Plaintiff's combination of impairments under the Listing;[3] and (5) failed to properly assess Plaintiff's residual functional capacity.  In reviewing the record as a whole, the Court agrees.

## A.    **Treating Physicians' Opinions**

The ALJ gave substantial weight to Dr. Ross's opinion and gave little weight to the opinions of Drs. Del Valle,[4] Moutier, and Rousseau.[5]  (Tr. 20-21.)  Plaintiff contends that the ALJ erred in giving substantial weight to the opinion of Dr. Ross, a non-treating and non-examining physician.  Plaintiff also argues that the ALJ failed to give proper weight to the opinions of Plaintiff's treating physicians, Drs. Moutier and Terkeltaub.  The Court agrees.

---

[3] As discussed below, after crediting the opinions of Plaintiff's treating physicians and Plaintiff's pain testimony, the Court finds that Plaintiff is disabled.  Accordingly, the Court need not reach the issue of whether Plaintiff's combination of impairments equal an impairment under the Listing.  See 20 C.F.R. § 404.1525(c)(5). ("If your impairment(s) does not meet or medically equal the criteria of a listing, we may find that you are disabled or still disabled at a later step in the sequential evaluation process.").

[4] Plaintiff does not challenge the weight that the ALJ gave to Dr. Del Valle's opinion.

[5] In weighing the doctors' opinions, the ALJ found that "Dr. Rosseau's assessment was not supported by her own clinical analysis of claimant and is generally inconsistent with the balance of the medical record." (Tr. 21.)   After extensive review of the record, neither the Court nor Defendant can find any evidence that Plaintiff was treated or evaluated by Dr. Rousseau. (See ECF No. 15 at 9 n.6.)  Defendant asserts that the ALJ's reference to "Dr. Rousseau" is a clerical error and that the ALJ was referring to Dr. Moutier's opinion. (Id.)  Because Plaintiff had visited numerous physicians, it is unclear if the ALJ was in fact referring to Dr. Moutier.  Accordingly, the Court declines to treat  the ALJ's reference to "Dr. Rousseau" as simply a clerical error intended to refer to Dr. Moutier.

There are three types of medical opinions – treating physicians, examining physicians, and non-examining physicians – and each type is accorded different weight. See Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009).  As a general matter, opinions of treating physicians are given controlling weight when supported by medically acceptable diagnostic techniques and when not inconsistent with other substantial evidence in the record.  See 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. Where a treating physician's opinion is contradicted by another doctor, the ALJ may not reject the treating physician's opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record.  Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1990).  In doing so, the ALJ must do more than proffer his own conclusions – he must set forth his own interpretations and why they are superior to that of the treating physician's.  Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988).  The ALJ may meet this burden by conducting a detailed and thorough discussion of the facts and conflicting evidence, and by explaining his interpretations and findings.  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).

Even if the treating physician's opinion is inconsistent with other substantial evidence in the record, the treating physician's opinions are still entitled to deference and must be weighted using the factors provided in 20 C.F.R. § 404.1527.  Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001); SSR 96-2p.  These factors include, inter alia, the "nature and extent of the treatment relationship" between the patient and treating physician, the "length of the treatment relationship and the frequency of examination," the amount of relevant evidence that supports the opinion and the quality of the explanation provided, and the consistency of the medical opinion with the record as a whole.  20 C.F.R. § 404.1527(d)(2)-(6).

1

2

### 1. Dr. Ross's Opinion

3

The ALJ provided two reasons for giving substantial weight to Dr. Ross's opinion.

4

First, the ALJ noted that Dr. Ross's opinion was based on "physical examinations of

5

claimant, his observations of her condition and claimant's statements as to her activities

6

of daily living." (Tr. 20.)  Second, the ALJ remarked that Dr. Ross's opinion was

7

consistent with the balance of the medical record.  (Id.)

8

First, it appears that the ALJ relied upon Dr. Ross's opinion as an examining

9

10

physician, but there is nothing in the record indicating Dr. Ross physically examined or

observed Plaintiff. (See Tr. 303-13.)  In his Medical Consultant Response dated

11

November 13, 2008, Dr. Ross remarked "file reviewed" but did not include any notes

12

based on a physical examination of Plaintiff. (See Tr. 311-12.)  In another Medical

13

Consultant Response dated December 24, 2008, Dr. Ross remarked "Newly acquired

14

MER reviewed," but again his records do not indicate that he physically examined or

15

16

observed Plaintiff.  (See Tr. 312.)

17

Second, the Court disagrees that Dr. Ross's opinion was consistent with the

18

balance of the medical record as a whole.  Dr. Ross submitted his report in December

19

2008, over a year before the ALJ hearing on May 18, 2010.  Dr. Ross did not review all of

20

Plaintiff's medical records and therefore did not have the benefit of knowing that Plaintiff

21

demonstrated positive fibromyalgia trigger points, including eighteen of eighteen on

22

23

January 12, 2009 (Tr. 291) and greater than ten of eighteen on February 23, 2009 (Tr.

24

387) and May 18, 2009 (Tr. 372).  Further, Dr. Ross did not have the benefit of reviewing

25

the assessment of Plaintiff's treating physician, Dr. Moutier, regarding Plaintiff's physical

26

27

capabilities.  (See Tr. 307, 314.)

28

//

Accordingly, the Court finds the ALJ erred in giving substantial weight to Dr. Ross's opinion.

2.   Dr. Moutier

The ALJ gave little weight to Dr. Moutier's opinion that Plaintiff is completely disabled. (Tr. 21.)  The ALJ found that based on Dr. Moutier's own treatment notes, Plaintiff showed improvement after treatment and finding the appropriate medication and dosages.  (Id.)  However, Dr. Moutier's treatment notes, the same ones referenced by the ALJ, suggest Plaintiff was both improving[6] and declining during treatment.  The Court highlights that in the same entry as Dr. Moutier observed improvements in Plaintiff's depression, Dr. Moutier also observed that Plaintiff's pain had "worsened significantly." (Tr. 234.)  Additionally, on February 9, 2009, Dr. Moutier noted that while Plaintiff was socializing more with family, her depression symptoms had "worsened moderately" and she was experiencing sharper pain.  (Tr. 388.)  Dr. Moutier also noted on May 18, 2009, that pain was the focus of Plaintiff's treatment (Tr. 373) and by June 17, 2009, Plaintiff was unable to visit her mother (Tr. 366).

In a letter dated February 8, 2010, Dr. Moutier concluded that "while her treatment plan has been aggressive and she has been 100% compliant with treatment, the treatment has only proven partially effective thus far at resolving her symptoms, leaving her in a completely disabled state."  Despite his duty to conduct a detailed analysis of

---

[6] The ALJ noted that Plaintiff made "considerable progress over the course of treatment" by accepting substitute teaching jobs again. (Tr. 20.)  Although this statement is based on an entry by Dr. Stoddard (Tr. 249), the ALJ found that Plaintiff has no posted work after June 5, 2008. (Tr. 16.)

3:11-CV-00838-BTM-DHB

conflicting evidence, the ALJ did not review Dr. Moutier's February 2010 opinion and offered no reasons for ignoring or rejecting the assessment. (See Tr. 21.)

The Court finds the ALJ failed to provide specific and legitimate reasons for rejecting the opinion of Dr. Moutier, Plaintiff's treating physician.  Accordingly, the Court credits Dr. Moutier's opinion as a matter of law.  See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995) ("Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion 'as a matter of law.'") (citing Hammock v. Bowen, 879 F.2d 498, 502 (9th Cir.1989)).


3.  Dr. Terkeltaub

Dr. Terkeltaub has been Plaintiff's treating rheumatologist[7] since February 2008, and has treated Plaintiff various times, including February 11, 2008 (Tr. 286), July 21, 2008 (Tr. 253), December 18, 2008 (Tr. 254), January 12, 2009 (Tr. 391), February 23, 2009 (Tr. 387), May 18, 2009 (Tr. 371), and September 14, 2009 (Tr. 355).   The ALJ did not give any weight to Dr. Terkeltaub's opinion that Plaintiff tested positive for fibromyalgia trigger points, including eighteen of eighteen. (See Tr. 20-21, 286.)

The ALJ referenced Dr. Terkeltaub's opinion only once in the context of Plaintiff's credibility regarding pain intensity. The ALJ commented that "Dr. Terkeltaub noted in September 2009 that claimant had been sleeping better on CPAP, she [sic] tolerating depression and fibromyalgia well on medication, and she showed improvement while all her tender points are better." (Tr. 19.)  The ALJ, however, omitted an essential word.  In

_____

[7] Plaintiff has also been treated by various other rheumatalogists in the VA Medical Center's rheumatology clinic, including Dr. Lin (Tr. 282), Dr. Kalunian (Tr. 284, 243), Dr. Greenberg (Tr. 278), and Dr. Pichetshote (Tr. 272).  The ALJ did not give weight to any rheumatologists' opinion. (See Tr. 20-21.)

his treatment notes dated September 14, 2009, Dr. Terkeltaub noted "all her tender points are less better," indicating Plaintiff's fibromyalgia symptoms were not improving. (See Tr. 356.)  Although Dr. Terkeltaub's use of the phrase "less better" may be unclear, the ALJ cannot rely on this treatment note to show Plaintiff was improving.

Accordingly, the ALJ erred in failing to provide specific and legitimate reasons for ignoring the opinion of Dr. Terkeltaub, Plaintiff's treating rheumotologist.  See Benecke, 379 F.3d at 594 n.4 (noting that because rheumatology is the relevant specialty for fibromyalgia, a rheumatologist's opinion should be given greater weight than those of the other physicians).

In sum, the ALJ erred in giving substantial weight to Dr. Ross because there is no indication in the record that Dr. Ross physically examined the Plaintiff, and Dr. Ross did not review all the pertinent medical records.  Further, the ALJ erred in failing to provide specific and legitimate reasons for giving little weight to the assessment of Dr. Moutier and for ignoring the opinion of Dr. Terkeltaub.  Accordingly, the opinions of Drs. Moutier and Terkeltaub are entitled to controlling weight.

**B.     Plaintiff's Pain Testimony**

Plaintiff argues the ALJ erred in finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible because the ALJ did not consider the record as a whole.

Once the claimant produces evidence of an underlying impairment, the ALJ may not discredit the testimony as to the severity of the pain merely because it is unsupported by objective medical evidence.  Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1991) (en banc).  The ALJ must provide "clear and convincing" reasons for rejecting the claimant's

testimony unless there is affirmative evidence that the claimant is malingering.  <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir. 1989).  The ALJ also must identify what testimony is not credible and what evidence undermines the claimant's complaints.  <u>Lester</u>, 81 F.3d at 834.

The ALJ provided four reasons for rejecting Plaintiff's testimony as to the intensity, persistence, and limiting effects of her symptoms.  First, the ALJ noted that Plaintiff had not sought significant treatment for her alleged back pain. (Tr. 19.)  Second, the ALJ remarked that Plaintiff had been treated for fibromyalgia since 1996 but remained in the military until 1998. (<u>Id.</u>)  Third, the ALJ noted that in March 2008, Plaintiff showed diffuse trigger points but no joint tenderness in hands or wrists. (<u>Id.</u>)  Fourth, the ALJ found that Plaintiff's fibromyalgia condition showed improvement throughout 2008 and 2009.  (<u>Id.</u>)  The ALJ remarked that by July 2008, although she still reported pain, Plaintiff's fibromyalgia symptoms had improved substantially on a low dose of Lyrica; by March 2009, Plaintiff rated her pain at 4/10 that worsens during the day and felt no pain on some days; by July 2009, Plaintiff's sleep, appetite, and activity level had improved; by August 2009, Plaintiff was cooking and seeing her family again; and by September 2009, according to the ALJ, Plaintiff was "sleeping better on CPAP, she [sic] tolerating depression and fibromyalgia well on medication, and she showed improvement while all her tender points are better."  (<u>Id.</u>)

As to the ALJ's first reason, although Plaintiff's back injury may contribute to her pain, Plaintiff's primary source of pain appears to be her fibromyalgia. (<u>See</u> Tr. 373, 399.)

Second, it is unclear why the ALJ discredited Plaintiff's pain testimony on the ground that Plaintiff remained in the military after being diagnosed with fibromyalgia. Prior to 2008, Plaintiff's fibromyalgia did not interfere with her ability to work.  After

Plaintiff's separation from the military, Plaintiff worked as a material coordinator, purchasing superintendent, and car salesperson and only missed one or two days of work a month. (Tr. 228.)  During this time, Plaintiff managed any pain or discomfort by taking medication, usually Baclofen or Tramadol. (Id.)  Beginning approximately October 2007, however, Plaintiff's pain increased despite medical therapy and medication until she could no longer manage the pain. (Tr. 67-72, 284.)

Third, Dr. Kalunian's March 2008 treatment notes do not warrant rejecting Plaintiff's credibility.  (Tr. 19.)  On October 10, 2008, Dr. Kalunian performed a joint exam and noted positive tender points. (Tr. 243.)  Further, Plaintiff demonstrated positive fibromyalgia trigger points on January 12, 2009 (Tr. 391), February 23, 2009 (Tr. 387), and May 18, 2009 (Tr. 371-72).

Fourth, in discussing Plaintiff's treatment notes, the ALJ omitted key points.  In the same July 2008 treatment notes referenced by the ALJ, Dr. Terkeltaub noted Plaintiff still has "widespread tender points in stereotypic locations for fibromyalgia." (Tr. 254.)  Further, as discussed above, the ALJ omitted an essential word when discussing Dr. Terkeltaub's September 2009 treatment notes.  Dr. Terkeltaub noted "all her tender points are less better," indicating that Plaintiff's condition was not improving.  (Tr. 356.)

The ALJ did not support his conclusion as to Plaintiff's lack of credibility with clear and convincing reasons, and no evidence suggested that Plaintiff was malingering.  Accordingly, the Court finds that the ALJ erred in discounting Plaintiff's testimony as to the intensity, persistence, and limiting effects of her symptoms.  The Court credits Plaintiff's testimony as a matter of law.  See Lester, 81 F.3d at 834.

//

//

## C.      Plaintiff's Veteran Administration's Disability Rating

Plaintiff contends that the ALJ erred in not giving proper weight the VA's disability rating of 80%. The Court agrees.

The Ninth Circuit has held that an ALJ must ordinarily give great weight to a VA determination of disability because of the marked similarity between these two federal disability programs.  McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002). However, an ALJ "may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record."  Id.  "The acquisition of new evidence or a properly justified reevaluation of old evidence constitutes a persuasive, specific, and valid reason . . . supported by the record."  Valentine, 574 F.3d at 695 (internal quotation marks omitted).

The ALJ gave little weight to Plaintiff's VA disability rating because it found that Plaintiff's pain and depression improved with treatment. (Tr. 20.)  The Court disagrees. The treatment notes relied on by the ALJ do not indicate Plaintiff's condition was improving, but, rather, was variable. (Tr. 355.)  See Lester, 81 F.3d at 833 (noting that "[o]ccasional symptom-free periods – and even the sporadic ability to work – are not inconsistent with disability") (internal citations omitted).  In September 2009, Dr. Terkeltaub noted Plaintiff's fibromyalgia tender points were not improving. (Tr. 356.) Further, in February 2010, Dr. Moutier found that while Plaintiff's treatment was aggressive, it did not resolve her symptoms, leaving her in a completely disabled state. (Tr. 314.)  Because the ALJ did not provide a persuasive, specific, and valid reason, the Court finds the ALJ erred in giving little weight to the disability rating**.**

//

//

3:11-CV-00838-BTM-DHB

**D.      Entitlement to Benefits**

Remand for further administrative proceedings is appropriate where enhancement of the record would be useful.  Benecke, 379 F.3d at 593.  On the other hand, the district court should remand for an immediate award of benefits where the record has been fully developed and further administrative proceedings would serve no useful purpose.  Id. Specifically, the court should credit evidence rejected by the ALJ as true and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting evidence; (2) there are no outstanding issues that must be resolved before the disability determination can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.  Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000) (citing Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996)).

The ALJ failed to provide legally sufficient reasons for rejecting Dr. Moutier's assessment of Plaintiff's limitations, for ignoring Dr. Terkeltaub's opinion of Plaintiff's fibromyalgia condition, and for discrediting Plaintiff's pain testimony.  In this case, when proper deference and weight is given to the assessment of Dr. Moutier, the opinion of Dr. Terkeltaub, and Plaintiff's pain testimony, Plaintiff does not have the residual capacity to perform sedentary work or any other substantial work that exists in the national economy. Accordingly, it is clear that the ALJ would be required to find Plaintiff disabled. Therefore, Plaintiff is disabled and is entitled to an award of benefits.

//

//

//

//

//

//

//

### VI.  CONCLUSION

For the reasons discussed above, Plaintiff's motion for summary judgment is **GRANTED** and Defendant's cross-motion for summary judgment is **DENIED**.   The decision of the ALJ is reversed, and the case is remanded to the Social Security Administration for a calculation of benefits.  The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

Dated: October 29, 2012

**HONORABLE BARRY TED MOSKOWITZ**

United States District Judge